# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAPSICUM GROUP, LLC | |
| Plaintiff, | CIVIL NO. 2:13-cv-05322-WY |
| v. | |
| BRIAN ROSENTHAL, GARRY A. PATE, & STOUT RISIUS ROSS, INC. | |
| Defendants. | |

## MEMORANDUM

YOHN, J.                                                    December 17, 2013

### Findings of Fact & Conclusions of Law

On September 12, 2013, Plaintiff Capsicum Group, LLC ("Capsicum") commenced this action against Garry Pate and Brian Rosenthal, who are former Capsicum employees, and Stout Risius Ross, Inc. ("SRR"), which is a Capsicum competitor and former Capsicum customer and Pate and Rosenthal's current employer. The same day Capsicum moved for a preliminary injunction to enforce restrictive covenants agreed to by Pate and Rosenthal as a condition of their employment (Doc. 2). I held a four-day hearing on Capsicum's motion on October 15, 16, 28, and 29. On November 13, 2013, having considered all the testimony and exhibits offered into evidence as well as the parties' written submissions, I issued an order granting in part and denying in part Capsicum's motion (Doc. 49).[1] I now make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

---

[1] The parties having impressed upon the court the need for a timely disposition of the motion, the order preceded the memorandum as to not unduly delay the parties.

## Findings of Fact

**I.      Parties**

      **A.      Capsicum**

      1.      Capsicum is a Philadelphia-based computer and legal services consulting company. It has practice groups in digital forensics and electronic discovery ("e-discovery") services, and its customer base consists of law firms, corporations, and government organizations. Capsicum is owned by its founder and Chief Executive Officer Samuel Goldstein. Capsicum has approximately 20 full-time employees and several part-time employees.

      2.      While Capsicum's headquarters is located in Philadelphia, it maintains additional offices in the New York, NY, Ft. Lauderdale, FL, and Washington, DC metropolitan areas. Of the 6,000 companies with which Capsicum has done business in the past five years, approximately 75% are located within 250 miles of one of these offices. As of five years ago, when the covenants not to compete were signed, as many as 95% of Capsicum customers were located within 250 miles of one its offices.

      3.      Capsicum's digital forensics and e-discovery practices offer a variety of services related to information recovery and reporting. For a digital forensics project, the chain of activities includes defining the data to be looked for; developing protocols for discovering data; physically collecting data from digital devices; analyzing collected data to learn relevant information; and reporting findings, possibly in the form of expert reports or testimony. For an e-discovery project, that chain includes collecting the relevant data; converting that data into a usable form; processing and hosting the data to enable attorney review; assisting attorneys with navigating the data; and assisting with production and/or reporting of relevant discovery information.

4.      Capsicum pursues customers for its digital forensics and e-discovery practices primarily through the direct efforts of Goldstein,[2] who has longstanding personal and business relationships with senior attorneys who decide which vendors to use for digital forensics and e-discovery projects. Capsicum's middle managers sometimes help Goldstein recruit new customers, make proposals for services, and promote the skills of Capsicum's consultants. Moreover, within the forensics and e-discovery practices, Capsicum's consultants generally have extensive customer contact over the course of a given project, as the nature of digital forensics and e-discovery work often requires collaboration with customers' technical and/or associate-level legal staff. While senior attorneys have the final say in choosing a digital forensics or e-discovery vendor, they typically do so with feedback and input from more junior personnel who have the most direct vendor contact. As a result, Capsicum consultants play a direct role in developing—or diminishing—Capsicum's reputation among its customer base, even if they are not involved in making direct pitches for business.

5.      In the course of pursuing its business, Capsicum developed three technological tools used by digital forensics and e-discovery teams. First, Capsicum developed and uses a widget called Ninja to do centralized data analysis gathering and analysis. While Ninja's functionality is akin to comparable commercially available technologies, Capsicum believes Ninja to be more effective. Second, Capsicum developed a computer program known as PST Cleans, which allows a user to remediate or remove data from a large number of computers distributed worldwide. Capsicum developed PST Cleans to do data removal for a corporate

---

[2] While the parties frequently use the term "clients" to refer to the law firms, business organizations, and government entities for which Capsicum and SRR perform services for a fee, Black's Law Dictionary defines a "client" as "a person or entity that employs a professional for advice or help in that professional's line of work." *See* Black's Law Dictionary (9th ed. 2009). Accordingly, I use "customer" to refer to those entities with which Capsicum and SRR have business relationships.

customer with myriad international locations; it has deployed PST Cleans at least once since. Third, Capsicum has developed what it calls White Rabbit: a secure, internal digital platform that houses and centralizes key areas of company management. Information housed on White Rabbit includes business development information regarding specific customers, up-to-date project status information, information about firm assets, and billing and reporting portals. Capsicum also may develop and deploy original coding in the course of its computer work.  I find these various technologies are proprietary to Capsicum.

6.     Goldstein attributes Capsicum's commercial competitiveness in digital forensics and e-discovery to a combination of the above-mentioned proprietary technologies and its internal management and workflow practices. Goldstein described three such practices in his testimony to the court: (1) Capsicum's processes for designating the composition of its acquisition kits, which are physical briefcases of commercial wires and other computer hardware used by technicians to collect data in the field; (2) Capsicum's standard operating procedures for digital forensics and e-discovery, containing how-to guides for efficiently using proprietary and commercial technologies; (3) Capsicum's emphasis on internal communication and collaboration among its staff. Whatever the importance of these processes to Capsicum's business, I find that based on the evidence submitted, they were not unique to Capsicum and/or foreign to its competitors. To the contrary, I find Capsicum's attention to detail, management, and standardization represents a commendable commitment to well-known best practices.

7.     Capsicum customers differ in the typical intervals at which they engage Capsicum for new business, with normal intervals ranging from each month to every one or two years.

**B.     SRR**

8.      A Detroit, MI-based company with practice areas in multiple facets of the financial services industry, SRR also provides digital forensics and e-discovery services through its dispute advisory & forensics services practice group. SRR has its headquarters in Detroit, but it has several satellite offices including offices in New York and suburban Washington, DC. Capsicum and SRR are thus competitors who provide the same services from overlapping geographic regions. Of SRR's approximately 250 full-time employees, 12-15 are involved in providing digital forensics and/or e-discovery services.

9.      SRR's Detroit headquarters hosts the central servers and data processing facilities of its dispute advisory and forensics services group. These central servers may be accessed and utilized remotely through secure networks. I find that, when an SRR employee uses remote connections to input or manipulate Detroit-based data, the location of the work is in Detroit regardless of the physical location of the employee when inputting or manipulating the data.

10.     SRR's dispute advisory and forensics services group relies on commercially available technologies to provide services to their customers. Like Capsicum, SRR has its own processes and methods for staffing and equipping its teams. I find there is no evidence that SRR's technological capabilities are inferior to Capsicum's, that Capsicum's proprietary technologies would be of particular value to SRR, or that Capsicum's acquisition kits are more comprehensive and robust than SRR's acquisition kits.

11.     Although a competitor of Capsicum, SRR is also a former customer of Capsicum. In June 2013, SRR engaged Capsicum for assistance with a large, litigation support project for a government customer, whereby Capsicum would help SRR to migrate a large number of databases from one software system to another (the "Capsicum-SRR project"). In negotiating the agreement, SRR Managing Director Michael Kahaian assured Goldstein that this cooperative

relationship between competitors would be "above board," allaying Goldstein's concerns that Capsicum confidential information would be poached. Staffed by Capsicum on the Capsicum-SRR project were Pate, Rosenthal, and a third Capsicum employee named Robert Johnson. During the course of the project, Pate and Rosenthal approached SRR about hiring them and eventually SRR did so. Thereafter SRR terminated the SRR-Capsicum business relationship.

      **C.**     **Pate**

12.     Garry Pate was a Capsicum employee from 2008 until approximately Labor Day 2013, when he left Capsicum to take a job with SRR. A resident of Hagerstown, MD, Pate joined Capsicum as Senior Forensic Consultant for the DC, Maryland, & Virginia region, and rose to become team leader of Capsicum's e-discovery practice, managing technical professionals located across the country.

13.     At the time he joined Capsicum, Pate already had substantial experience in computer forensics. Pate began his career with CACI, a federal government contractor, where he performed digital forensics and e-discovery services. In 2002, Pate joined the Securities and Exchange Commission ("SEC") as an information technology specialist in the computer forensics department. Pate also possesses multiple relevant professional certifications. Specifically, Pate is a certified computer hacking forensic investigator; a certified computer forensic examiner; a certified trainer for the CaseMap, TiMap, and EnCase utilities; a certified electronic evidence collections specialist, a certified advance cell phone examiner, and a certified handheld examiner. Pate obtained all but two of these certifications while he was working at the SEC.

14.     As the senior official in Capsicum's Washington, DC office, Pate played an active role in Capsicum's business development efforts. He joined Goldstein on a number of sales calls

and Capsicum promoted his skills and government experience to potential customers, particularly in the Washington, DC region. As team leader of the e-discovery team, Pate had significant duties related to management, goals, and operations for e-discovery team projects and personnel.

15.     As a senior technician and e-discovery team leader, Pate had access to Capsicum's proprietary tools and confidential information related to digital forensics and e-discovery.

16.     In July 2013, Pate was staffed on the Capsicum-SRR project along with Rosenthal and Johnson. Pate worked for two weeks on the project at SRR's Detroit headquarters; he then worked remotely from the Washington, DC area using facilities and software that were owned or licensed by SRR. Shortly after the Capsicum-SRR project began, Pate approached the SRR Managing Director Kahaian about the possibility of joining SRR full time. Pate did not, at any point, encourage and/or recruit Rosenthal or Johnson to leave Capsicum for SRR. Pate signed a contract with SRR in late August, and gave notice to Capsicum shortly thereafter.

17.     At SRR, Pate is a director in the dispute advisory and forensics services group, where he manages a team of geographically dispersed consultants concentrating in digital forensics work. Although he is formally assigned to the Detroit office—where SRR's servers and data processing facilities are located—Pate does not, at this time, anticipate moving to Michigan. Rather, he intends to work principally from near his Hagerstown, MD home, possibly including SRR's Washington, DC office. I find that those aspects of his job which involve data processing and data management may be done through SRR's Detroit-based servers and data facilities; his job is also likely to include customer interface on technical matters, as is the nature of digital forensics work.

18.     Pate may benefit from using Capsicum confidential information in his employment with SRR. But because Pate is joining an established operation with its own existing processes, techniques, and business strategies, I find it is not inevitable that he will leverage Capsicum confidential information in his position with SRR. .

**D.     Rosenthal**

19.     Rosenthal's story is similar to Pate's. Hired by Capsicum in 2009 as a Senior Consultant, Rosenthal left Capsicum around Labor Day 2013 to join SRR. Rosenthal is a resident of Brooklyn, NY who, while at Capsicum, worked out of Capsicum's New York office as a member of Pate's e-discovery team.

20.     Rosenthal, too, arrived at Capsicum with substantial industry experience. He received a Bachelor of Science in computer science from Rutgers University in 2003, and thereafter began his career as a paid computer forensics intern at the Kroll company. Kroll is a competitor and occasional partner of Capsicum sufficiently similar to Capsicum that Goldstein, in his testimony, described Capsicum as a "tiny Kroll." At Kroll, Rosenthal received a promotion to the position of computer forensics engineer, and in that role developed his abilities in computer forensic analysis. While at Capsicum, Rosenthal enrolled in a number of online training courses to develop his skills and/or keep them up-to-date at his own initiative and expense.

21.     Unlike Pate, Rosenthal did not have promotional or external business development responsibilities at Capsicum. However, as a technical consultant on Capsicum's e-discovery team with wide-ranging involvement in his team's practice, Rosenthal interfaced with the customers on the Capsicum projects to which he was staffed. Moreover, Rosenthal went beyond the ordinary customer interface necessary for his technical job, playing an active role in

managing Capsicum's business relationships on behalf of the company. This is evidenced by Rosenthal's own description of the nature of this customer contact in a correspondence related to his 2012 performance review. He stated, "This year, I've been given the responsibility of making clients comfortable and happy. I'm constantly e-mailing and on the phone, communicating with my clients. Some of this is directly work-related, but a lot of it is relationship development/maintenance." (Pl. Ex. 4).

22.     Rosenthal's position at Capsicum gave him use of and access to Capsicum's proprietary tools and information about its business strategies for digital forensics and e-discovery work.

23.     As a Capsicum staff member assigned to the Capsicum-SRR project, Rosenthal worked in Detroit for the first two weeks of the project and later worked from his home base in New York via remote connection to SRR's Detroit-based servers. While on-site in Detroit, Rosenthal observed a private conversation between Pate and Kahaian, and, after asking Pate about the subject of the conversation, learned Pate had approached Kahaian about possible employment with SRR. Rosenthal then initiated his own conversation with Kahaian about possible employment with SRR, setting in motion his departure from Capsicum to join SRR on roughly the same timetable as Pate. While Rosenthal once asked Johnson if he, too, was interested in speaking with Kahaian about a job with SRR, I find that Rosenthal's inquiry was in the nature of a polite, casual comment and that he did not encourage, incentivize, or attempt to recruit Johnson to leave Capsicum.

24.     At SRR, Rosenthal is a project manager in the dispute advisory and forensics services group reporting directly to Pate. He is formally assigned to the Detroit office, but Rosenthal intends to work principally from SRR's New York office via remote connection to

SRR's central servers and data processing facilities in Detroit. Insofar as SRR's forensics work involves customer interface, Rosenthal's geographic presence in New York will place him in proximity to the Capsicum regional customer base with which he worked, helping to develop Capsicum's reputation. I find there is no evidence indicating Rosenthal intends to recruit Capsicum customers to redirect their digital forensics or e-discovery business to SRR.[3] Moreover, as with Pate I find that those aspects of Rosenthal's job with SRR which involve data processing and data management may be done through SRR's Detroit-based servers and data facilities.

25. Like Pate, Rosenthal may benefit from using Capsicum confidential information in his employment with SRR. But again, because Rosenthal is joining an established operation with its own existing processes, techniques, and business strategies, I find it is not inevitable that he will leverage Capsicum's confidential information in his position with SRR.

## II. The Agreement

26. When Pate and Rosenthal began their respective employments with Capsicum, they each signed an employment agreement containing substantially similar restrictive covenants ("the Agreement").[4] The Agreement was Exhibit A to their respective contracts, under which each was paid over $100,000 per year. Each had other employment opportunities at the time they joined Capsicum—Rosenthal had an offer at the commencement of his employment with a

---

[3] Subsequent to agreeing to join SRR, Rosenthal had contact with an attorney at a Capsicum client with whom he had worked closely while at Capsicum. I find that this was a purely social contact as evidenced by Rosenthal's testimony and the attorney's testimony. In any event, that attorney has a marginal influence in making vendor hiring decisions compared to senior partners who have longstanding relationships with Goldstein. Subsequent to agreeing to join SRR, Rosenthal also had contact with an e-discovery professional who previously worked for a Capsicum customer. I find this was a social contact as well.

[4] There are slight differences in the agreements signed by Pate and Rosenthal, none of which are relevant to the issues presented by the motion. As the pertinent substance is identical, I refer to a single Agreement as a matter of tidiness.

government contractor and Pate was already employed by the SEC. Pate was represented by counsel when he signed the Agreement.

27.     The heart of the Agreement is a series of six restrictive covenants related to Capsicum confidential information, the solicitation of Capsicum employees, and competing with Capsicum. The substantive provisions provide the following in relevant part:

28.     Paragraph 2.1 provides the employee shall not disclose Capsicum's confidential information to any third party or use it in any fashion, except in the course of performing his duties to Capsicum.

29.     Paragraph 4.1 provides, for a two year period following the termination of his employment, the employee will not recruit and/or solicit for hire any Capsicum employees or subcontractors without prior approval from Capsicum.

30.     Paragraph 5.3.1 provides, for a two year period following the termination of his employment and only within a 250 mile radius of any Capsicum office then existing,[5] the employee will not accept income or payment from any current or former Capsicum customers for providing any of the services in Capsicum's "field of interest." Under the Agreement, Capsicum's field of interest consists of cyber investigations, media recovery, electronic discovery or digital forensic services, security, technology compliance, expert testimony, and sales.

---

[5] Paragraph 5.3 of the Agreement clearly establishes that Paragraphs 5.3.1, 5.3.2, 5.3.3, and 5.3.4 apply for a two year period following the term of employment. Paragraph 5.5.5 refers to "the specific geographic scope which includes the territory of 250 miles from any office of the company at the time of recipient termination for the provisions of this Section 5 . . . ." Although not crystal-clear under the wording of the Agreement, the parties agreed that the only reasonable interpretation of this clause is that the restrictions contained in each of the Section 5 paragraphs only apply within 250 miles of Capsicum offices existing at the time the employment ends. Moreover, Pate testified that, at the time he signed the Agreement, this was his attorney's understanding of the provision. I agree, and treat Paragraph 5.5.5 as imposing a geographic limitation on the four restrictive covenants within Section 5.

31.     Paragraph 5.3.2 provides, for a two year period following the termination of his employment and only within a 250 mile radius of any Capsicum office then existing, the employee will not have any type of financial interest or employee, management, or director relationship with any business "involved in" the field of interest.

32.     Paragraph 5.3.3 provides, for a two year period following the termination of his employment and only within a 250 mile radius of any Capsicum office then existing, the employee will not compete with Capsicum by attempting to solicit or appropriate Capsicum partners, customers, or patrons, or those prospective customers with which Capsicum has begun to develop relationships or to which it has made a presentation for services.

33.     Paragraph 5.3.4 provides, for a two year period following the termination of his employment and only within a 250 mile radius of any Capsicum office then existing, the recipient will not compete with Capsicum in the field of interest nor perform any field of interest services that are offered by Capsicum, except as an employee of non-competing private industry organizations or government entities.

34.     Pate and Rosenthal signed the Agreement willingly. They were aware of the Agreement's provisions.

35.     Pate and Rosenthal each disclosed the existence of the Agreement to SRR at the time of their applications. SRR nonetheless extended employment offers to Pate and Rosenthal, believing that portions of the Agreement were unenforceable and that Pate and Rosenthal's prospective employment with SRR would not violate those portions of the Agreement that were enforceable. In Pate and Rosenthal's employment contracts with SRR, SRR agreed to indemnify Pate and Rosenthal for litigation costs arising from the Agreement.

## CONCLUSIONS OF LAW

**I.    Legal Standards**

1.    The standard for issuing a preliminary injunction for a federal court sitting in diversity is a question of federal procedural law. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989); *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 475 (E.D. Pa. 2007). "In determining whether to grant a preliminary injunction, a [federal] court must consider whether the party seeking the injunction has satisfied four factors: (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (internal quotations omitted). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

**II.    Breach of Contract Claim Against Pate and Rosenthal**

    **A.    Likelihood of Success on the Merits**

        **i.    Applicable Law**

2.    For Capsicum to secure preliminary injunctive relief against Pate and/or Rosenthal based on any of the Agreement's six restrictive covenants, it must show Pate and/or Rosenthal are likely to breach those covenants and that Capsicum would be successful on the merits. There can only be breach, however, where the covenant is enforceable, and the unenforceability of a covenant is an affirmative defense on which the defendant bears the burden of proof. *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (citing *WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005)). Here, the defendants argue the Section 5

restrictive covenants are unenforceable, but that Pate and Rosenthal are in any event not likely to breach any portion of the Agreement notwithstanding their employment with SRR.

3.     In considering the enforceability of the Section 5 covenants, I apply Pennsylvania law as stipulated to in Paragraph 9.1 of the Agreement.

4.     In Pennsylvania, a covenant not to compete is valid and enforceable when it is "incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent.'" *Victaulic Co.*, 499 F.3d at 235 (quoting *Hess v. Gebhard Co. & Inc.*, 808 A.2d 912, 917 (Pa. 2002)).

5.     "To be reasonably necessary for the protection of the employer, a covenant must be tailored to protect legitimate interests." *Victaulic Co.*, 499 F.3d at 235. "[L]egitimate business interests include confidential information, goodwill, unique or extraordinary skills, and specialized training that would benefit competitors." *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 424 (3d. Cir. 2010). A covenant may not be used, however, to establish a competitive advantage for an employer. *Hess*, 808 A.2d at 920-21. ("If the covenant is inserted into the agreement for some other purpose, as for example, eliminating or repressing competition or to keep the employee from competing so that the employer can gain an economic advantage, the covenant will not be enforced.").

6.     Meanwhile, "[t]he reasonableness of the temporal and geographic aspects of a restrictive covenant must be determined in light of the nature of the employer's interest sought to be protected." *Boldt Machinery & Tools, Inc. v. Wallace*, 366 A.2d 902, 907 (Pa. 1976).

7.     "When . . . the covenant imposes restrictions broader than necessary to protect the employer . . . a court of equity may grant enforcement limited to those portions of the restrictions

that are reasonably necessary for the protection of the employer." *Hess*, 808 A.2d at 920. Thus, "where a restrictive covenant is found to be overbroad and yet the employer is clearly entitled to some measure of protection from the acts of his former employee, the court may grant such protection by reforming the restrictive covenant and enforcing it as reformed." *Thermo-Guard, Inc. v. Cochran*, 596 A.2d 188, 194 n.9 (Pa. Super. 1991). While gratuitous overbreadth of a provision militates against enforcement, *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 254-55 (Pa. 1976), as a general matter "the man who wildly claims that he owns all the cherry trees in the country cannot be denied protection of the orchard in his back yard." *Barb-Lee Mobile Frame Co. v. Hoot*, 206 A.2d 59, 60 (Pa. 1965).

### ii.     Application to Restrictive Covenants

#### a.     Paragraph 2.1: Likelihood of Breach

8.      Pate and Rosenthal have acquired substantial knowledge of Capsicum's unique technologies, business strategies, customer information, and other confidential information; Paragraph 2.1 strictly prohibits Pate and Rosenthal from disclosing or using this information outside of their previous employment with Capsicum. Meanwhile, Pate and Rosenthal's employment with SRR has them doing similar work in the same geographic area for a Capsicum competitor. There is thus a substantial likelihood that Pate and Rosenthal would—if unrestrained—attempt to use such information to the benefit of their new employer. Capsicum has therefore shown a likelihood of success regarding the Paragraph 2.1 nondisclosure covenant.

#### b.     Paragraph 4.1: Likelihood of Breach

9.      Notwithstanding the close proximity of Pate's and Rosenthal's departures from Capsicum and the short inquiry Rosenthal made of Johnson, neither Pate nor Rosenthal has solicited or attempted to solicit each other or another Capsicum employee to leave the

organization as prohibited by Paragraph 4.1. There has been no showing that they are likely do

so in the future, particularly in light of the deterrent threat of post-hoc remedies available to

Capsicum should a violation be discovered. Accordingly, Capsicum has not demonstrated that it

is likely to succeed on any claim it may have under the Paragraph 4.1 nonsolicitation covenant.

### c.      Paragraph 5.3.1: Enforceability and Likelihood of Breach

10.     Paragraph 5.3.1 is indisputably incident to an employment relationship between

the parties, as both Pate and Rosenthal entered into the Agreement at the same time they signed

their employment contracts.

11.     By limiting Pate and Rosenthal's ability to accept income from current and former

Capsicum customers, Paragraph 5.3.1 protects Capsicum's legitimate interest in its goodwill.

The Pennsylvania Supreme Court has defined goodwill as "essentially the positive reputation

that a particular business enjoys," *Hess*, 808 A.2d at 922, "represent[ing] a preexisting

relationship arising from a continuous course of business." *Butler v. Butler*, 663 A.2d 148, 152

n.9 (Pa. 1995). Where employees have longstanding relationships with customers and access to

confidential information regarding customer lists, pricing, and business strategies—as did Pate

and Rosenthal—those relationships likely implicate the goodwill interests of the employer. *See*

*Zambelli*, 592 F.3d at 424; *Siemens Med. Solutions Health Servs. Corp. v. Carmelengo*, 167 F.

Supp. 2d 752, 760 (E.D. Pa. 2001); *Nat'l Bus. Servs. Inc. v. Wright*, 2 F. Supp. 2d 701, 708 (E.D.

Pa. 1998). I found that Pate and Rosenthal had substantial interactions with Capsicum customers,

and so I conclude here that Pate and Rosenthal each implicate Capsicum's goodwill, entitling

Capsicum to protect its investment in its customer relationships through reasonable restrictions

on Pate and Rosenthal. *See Victaulic Co.*, 499 F.3d at 235. As Paragraph 5.3.1 restricts Pate and

Rosenthal only as to their dealings with Capsicum current and former customers—the group of

companies with which Capsicum is likely to have goodwill, *see Butler*, 663 A.2d at 152 n.9—it is tailored to Capsicum's goodwill interest and thus reasonably necessary for Capsicum's protection. *See Victaulic Co.*, 499 F.3d at 235.

12.     Paragraph 5.3.1 is also reasonable in its two year duration and geographic extent of 250 miles from any Capsicum office existing at the time of Pate and Rosenthal's departures. The two year duration is matched to the longer interval periods for Capsicum customers to typically approach Capsicum about a new business engagement. The territory matches the geographic area where Capsicum's customer base is concentrated, as 75% of Capsicum customers in the past five years are located within 250 miles of a current Capsicum office and an even greater percentage of Capsicum customers were located within the restricted zone at the time Pate and Rosenthal each signed the Agreement. *See Boldt Machinery & Tools, Inc.*, 366 A.2d at 907 ("The reasonableness of the temporal and geographic aspects of a restrictive covenant must be determined in light of the nature of the employer's interest sought to be protected."). Courts applying Pennsylvania law routinely enforce covenants lasting for at least two years and/or covering broad geographic regions when those terms are, as here, matched to a relationship between the employer's interests and the employee's duties. *See, e.g. Zambelli*, 592 F.3d at 412 (upholding two year, nationwide covenant); *Nat'l Business Servs.*, 2 F. Supp. 2d at 708 (upholding one year, nationwide covenant); *Sidco Paper Co.*, 351 A.2d at 250 (upholding two year covenant applying in five state area).

13.     Because the defendants have not shown that Paragraph 5.3.1 is not incident to an employment relationship between the parties, not reasonably necessary for Capsicum's protection, or not reasonable in duration or geographic scope, they have failed to show that

Paragraph 5.3.1 is unenforceable. *See Victaulic Co.*, 499 F.3d at 234, *WellSpan Health*, 869 A.2d at 999.

14.     Because Paragraph 5.3.1 will be enforced, my inquiry turns to whether Pate and Rosenthal are likely to breach the covenant by virtue of their employment with SRR. The terminated SRR-Capsicum business relationship makes SRR a former Capsicum customer within the meaning of Paragraph 5.3.1, and Pate and Rosenthal's contracts with SRR state they will be receiving payment from SRR for services within the field of interest. However, while Pate and Rosenthal each hopes to work principally for SRR from close to their current homes which are within the restricted zone, they are affiliated with SRR's Detroit office, which is located outside the restricted zone. Detroit is also the physical location of the computer facilities for SRR's dispute advisory and forensic services group, which Pate and Rosenthal can remotely access for much of their work. As the parties present no authority to advise me on whether Pate and Rosenthal's remote activities from Washington, DC and New York are more properly attributed to those cities or Detroit, I consider that question equitably. I conclude Pate and Rosenthal will not violate Paragraph 5.3.1 if they communicate with other SRR employees or work on customer matters via Detroit-based servers while physically present in Washington, DC or New York. They will violate Paragraph 5.3.1 if they have substantive contact with customer personnel while they are physically present within the restricted zone.[6] This means Pate and Rosenthal are prohibited from participating in data collections taking place within the restricted zone, which

---

[6] In delineating what customer contact is permissible from within the restricted zone, I use the line drawn by the parties in their stipulated temporary restraining order ("TRO"). The TRO stipulated that it would not be a violation for Pate or Rosenthal, while in the restricted zone, to receive an inquiry from a customer on a technical issue and then forward that inquiry to another SRR employee and/or respond to the customer stating another employee will assist. My order contains the same stipulation.

the testimony indicated was when Pate and Rosenthal were most likely to have substantial client interaction were an injunction not in place.

15.     Because I find Pate and Rosenthal's employment with SRR is likely to involve substantive customer contact while they are within the restricted zone, I conclude that they are likely to violate Paragraph 5.3.1 if they are not restrained. Accordingly, it is likely SRR would succeed on the merits of a claim under Paragraph 5.3.1.

### d.     Paragraph 5.3.2: Enforceability and Likelihood of Breach

16.     In broadly prohibiting Pate and Rosenthal from affiliating with any business involved in the defined field of interest—irrespective of whether Pate, Rosenthal, or Capsicum ever had prior contact with or even knowledge about that company—Paragraph 5.3.2 reaches far beyond Capsicum's protectable interests. Capsicum's goodwill interest only extends to companies with which Capsicum has had a "continuous course of business." *See Butler*, 663 A.2d at 152 n.9. Capsicum does not have a protectable interest in Pate or Rosenthal's skills, as this is not a case where the employer's investments have given the employees unique or special competencies. *Cf. Zambelli*, 592 F.3d at 424-25.  And Capsicum's confidential information is protected by Paragraph 2.1 and it is not inevitable that Pate or Rosenthal will nonetheless disclose or use that information, so a noncompete clause is not reasonably necessary to further protect Capsicum's confidential information. *See Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 846-47 (Pa. 1957); *PharMethod, Inc.*, 382 F. App'x at 221. As it extends far beyond what would be reasonably necessary to protect Capsicum, Paragraph 5.3.2 is unenforceable. *See*

*Victaulic Co.*, 499 F.3d at 234; *Sidco Paper Co.*, 351 A.2d at 254-55 (finding gratuitous overbreadth militates against enforcement of a covenant).[7]

17.     Because Paragraph 5.3.2 is unenforceable, it is not necessary to consider any possible breach by Pate or Rosenthal.

**e.      Paragraph 5.3.3: Enforceability and Likelihood of Breach**

18.     Although in some respects styled similarly to Paragraph 5.3.1, Paragraph 5.3.3 restricts Pate and Rosenthal as to their future business dealings with prospective Capsicum customers as well as actual Capsicum customers, including any company to which Capsicum has made a presentation of services, whether that presentation was pursued by the prospective customer in any way, or not. This prohibition would thus restrain Pate and Rosenthal's relationship with a wide swath of companies with which Capsicum has not had the continuous course of dealings that is essential to a goodwill interest. *See Butler*, 663 A.2d at 152 n.9. Paragraph 5.3.3 is therefore not tailored to Capsicum's legitimate goodwill interest and is accordingly unenforceable. *Victaulic Co.*, 499 F.3d at 234; *see also WellSpan*, 869 A.2d at 1001 (invalidating restrictive covenant applying to geographic area where employer did not compete and therefore had no goodwill interests).

19.     Because Paragraph 5.3.3 is unenforceable, it is not necessary to consider any possible breach by Pate or Rosenthal.

**f.      Paragraph 5.3.4: Enforceability and Likelihood of Breach**

---

[7] While not directly relevant to determining the initial validity of the Paragraph 5.3.2 covenant, it is worth noting that Paragraph 5.3.2, if enforced, would impose a substantial penalty on Pate and Rosenthal, prohibiting altogether their employment anywhere near their East Coast homes in the field in which they have been educated and trained for the entire period of their working lives. It is essentially a punishment of Pate and Rosenthal without serving any legitimate business interest of Capsicum.

20.     Like Paragraph 5.3.2, Paragraph 5.3.4 is a broad prohibition against Pate and Rosenthal from competing with Capsicum by performing services in the "field of interest" for anyone in the restricted area. It thus reaches far beyond any of Capsicum's protectable interests. *See Butler*, 663 A.2d at 152 n.9; *Zambelli*, 592 F.3d at 424-25; *Morgan's Home Equip. Corp.*, 136 A.2d at 846-47. Although the provision contains the caveat that the recipient may work in the "field of interest" for a government entity and/or for a non-competing private industry, the touchstone of the analysis here is whether or not the restrictions in the covenant are tailored to the employer's legitimate interests. *See Victaulic Co.*, 499 F.3d at 235; Hess, 808 A.2d at 917. As Capsicum does not have a legitimate interest that could justify a general non-competition covenant on Pate and Rosenthal, Paragraph 5.3.4 is unenforceable as not reasonably necessary for Capsicum's protection. *Victaulic Co.*, 499 F.3d at 234.

21.     Because Paragraph 5.3.4 is unenforceable, it is not necessary to consider any possible breach by Pate or Rosenthal.

### g.     Enforcement

22.     In consideration of the foregoing, I will enforce only those covenants within the Agreement that are reasonably necessary for Capsicum's protection, and I will consider injunctive relief only where enforceable covenants are likely to be breached in the course of Pate and Rosenthal's employment with SRR. Accordingly, only the covenants contained in Paragraphs 2.1 and 5.3.1 of the Agreement survive the first step of the preliminary injunction analysis.

## B.     Irreparable Harms, Harm to Nonmoving Party, and the Public Interest

23.     "Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain

pecuniary standards for the measurement of damages." *Nat'l Bus. Servs.* 2 F. Supp. 2d. at 709.

Where a restrictive employment covenant has been violated or is likely to be violated, "the threat

of the unbridled continuation of the violation and the resultant incalculable damage to the former

employer's business [ ] constitutes [ ] justification for equitable intervention." *Bryant v. Sling*

*Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977). Consequently,"[t]he great weight of

modern authority is to the effect that one who has been or will be injured [by the violation of a

restrictive covenant in an employment agreement] is ordinarily entitled to the equitable remedy

of injunction[.]" *Records Center, Inc. v. Comprehensive Management, Inc.*, 525 A.2d 433, 436

(Pa. Super. 1987).

     24.    In considering the balance of the harms, I am confident that an injunction

enforcing Paragraphs 2.1 and 5.3.1 of the Agreement will not impose excessive burdens on Pate,

Rosenthal, and SRR and will protect the legitimate business interests of Capsicum. As to

Paragraph 2.1, Pate and Rosenthal are not entitled to nor do they need to use Capsicum's

confidential information to work in their field; the provision does not restrict their ability to

make a living in any way so long as they do not seek to profit or utilize that which is proprietary

to Capsicum. As to Paragraph 5.3.1, Pate and Rosenthal remain substantially free to pursue their

chosen profession, limited only with respect to their dealings with Capsicum current and former

customers located within 250 miles of a Capsicum office, thus protecting Capsicum's legitimate

business interests as well. In their highly technological field which permits substantial work to be

done remotely, this geographic restriction may not prove much of a limitation at all, as evidenced

by the substantial amount of work that they will be able to do for SRR from their current home

regions in the restricted zone. Meanwhile, allowing Pate and Rosenthal to work from their homes

under the conditions of my order enhances their freedom without harming Capsicum, as even the Agreement as drafted does not permit them from working with the same data in Detroit.

25.     Finally, the public interest will be "best served . . . by upholding the restrictive covenants freely entered into by [Pate and Rosenthal]," as it will discourage "the disavowal of [their] freely contracted obligations" and prevent Pate and Rosenthal's wrongful exploitation of Capsicum's goodwill with its customers, including SRR. *Nat'l Bus. Servs.*, 2 F. Supp.2d at 709.

26.     Pate and Rosenthal will be enjoined based on the Agreement as modified.

## III.     Tortious Interference With Contract Against SRR

27.     Capsicum seeks a preliminary injunction against SRR on the view that SRR's recruitment and hiring of Pate and Rosenthal, in light of their employment agreements, constituted tortious interference with those agreements.

28.     In Pennsylvania, "one who intentionally interferes with an existing contractual relation is subject to liability for the breach of the contract." *Jacobson & Co. v. Int'l Env't Corp.*, 427 Pa. 439, 455 (1967). Here, however, although SRR was aware of the restrictive covenants binding Pate and Rosenthal, I found SRR believed portions of the Agreement were invalid and/or Pate and Rosenthal would not violate those portions of the Agreement that were valid by joining SRR. In light of (a) the challenges presented by evaluating how a covenant with a defined geographic scope applies to a remote working relationship, and (b) my conclusion that three of the four non-compete covenants were in fact unenforceable, SRR's view of the Agreement was reasonable and in good faith. *See United Aircraft Corp. v. Boreen*, 413 F.2d 694, 699-700 (3d Cir. 1969) ("[*Jacobson*] involved an intentional interference with an existing contractual relation. Here the district court found that the defendants believed in good faith that [the defendant]'s activities would not constitute a violation of the covenant. Jacobson is therefore distinguishable."). To the

extent SRR has induced Pate and Rosenthal to act in violation of the Agreement, it did not do so with the requisite *mens rea* to hold it liable for tortious interference. *See id*.

29.     Because Capsicum has not made a sufficient showing that SRR intentionally interfered with Pate and Rosenthal's employment agreements, SRR will not be enjoined on that basis.

_____ s/ William H. Yohn Jr._____
William H. Yohn Jr., J.